[Cite as *State v. Foster*, 2025-Ohio-5626.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                               No. 114642

    v.                           :

MARCUS FOSTER,                          :

    Defendant-Appellant.         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 18, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-692914-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kerry A. Sowul, Assistant Prosecuting Attorney, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Aaron T. Baker, Assistant Public Defender, *for appellant.*

EILEEN A. GALLAGHER, A.J.:

{¶ 1} Marcus Foster ("Foster") appeals the trial court's denial of his motions to suppress evidence in this murder case and raises issues of ineffective assistance of counsel. For the following reasons, we affirm the trial court's judgment.

{¶ 2} On June 19, 2023, at 4:15 a.m., Michael Walker was fatally shot by a person in a vehicle at the intersection of Denison Avenue and W. 84th Street in Cleveland, Ohio. Real time crime cameras ("RTCC"), as well as license plate reader cameras, recorded a gray Chevy Traverse (the "Traverse") leaving the scene of the shooting. The Traverse was registered to a woman who lived on W. 57th Street. Police detectives went to the woman's home and found the Traverse parked on the street in front of the house. The woman and a male, later identified as Foster, entered the Traverse and drove away. Police followed the Traverse and initiated a stop of the vehicle. Police learned that Foster was wearing a GPS ankle monitor and the data retrieved from this monitor placed him at the scene of the crime at the time of the shooting.

{¶ 3} On June 28, 2023, Foster was charged in a nine-count indictment for Walker's murder in Cuyahoga C.P. No. CR-23-682282 ("CR-23-682282"). Foster filed motions to suppress on November 20, 2023, December 11, 2023, January 19, 2024 and February 28, 2024. These four motions covered Foster's statements, gunshot residue ("GSR") test results, DNA test results and "GPS monitoring results." The motions to suppress were based on various arguments concerning Fourth Amendment violations and claimed that "any subsequent acquirement of" evidence against him was "fruit of the poisonous tree." On March 11, 2024, the court held a hearing on Foster's motions to suppress and ultimately denied all of them.

{¶ 4} On July 1, 2024, Foster was again charged with the same nine counts relating to the shooting of Walker case, Cuyahoga C.P. No. CR-24-692914 ("CR-24-

692914"). On July 29, 2024, on the State's motion, the court dismissed CR-23-682282 and found that "all filings and rulings are deemed filed and ruled upon in [the] new case 24-692914 as of the date of record in this case."

{¶ 5} Foster's case proceeded to trial and a jury acquitted Foster of one count of aggravated murder and found him guilty of the remaining eight counts in the indictment. After merging various offenses, the court sentenced Foster for his convictions of aggravated murder, discharge of firearm on or near prohibited premises and having weapons while under disability. These convictions included one-, three- and five-year firearm specifications, repeat violent offender specifications and notices of prior conviction. In the aggregate, the court sentenced Foster to life in prison with the possibility of parole after 51 to 54.5 years.

{¶ 6} Foster appeals, raising three assignments of error for our review:

I. The trial court erred by denying the motions to suppress evidence filed by Mr. Foster, stemming from his illegal stop, detention, and arrest, as fruit of the poisonous tree.

II. To the extent that trial counsel may have failed to preserve the issue of suppression of the stop of Mr. Foster, this failure constituted ineffective assistance of counsel under the Sixth Amendment to the United States Constitution.

III. Mr. Foster received ineffective assistance of counsel under the Sixth Amendment to the United States Constitution when his counsel failed to object to the admission of GPS location data.

**I. Testimony and Evidence Presented at Hearing on Motions to Suppress**

**A. Tim Cramer**

{¶ 7} Cleveland Police Department Homicide Unit Detective Tim Cramer ("Cramer") testified that on June 19, 2023 he responded to a homicide scene on Denison Avenue in Cleveland, Ohio. According to Cramer, he "didn't really have much influence there on scene," so he "went back to the homicide unit to do some further investigation . . . ." Cramer "received information about a car involved in the homicide via" RTCC and "an analyst was able to determine a plate on a car that was followed from the homicide scene." Cramer ran the license plate "through OLEG, finding its listed address connected to the plate . . . ." Cramer testified that "it was determined that we would drive to that address and conduct some initial surveillance to see if the vehicle was there and then make a determination if the vehicle was there, what the next steps would be."

{¶ 8} Cramer testified that the vehicle in question was the Traverse and he and his partner went to the address associated with the vehicle. The Traverse was parked in the street. Eventually, two people exited the house and entered the car and drove away. According to Cramer, "the female gets into the driver's seat. The male gets into the passenger's seat."

{¶ 9} Cramer and his partner followed the Traverse in an unmarked police vehicle and when they determined that the Traverse "was probably going to be getting onto the highway" they conducted a stop of the vehicle on a surface street with marked police vehicles ultimately arriving on scene. Cramer related that they

stopped the vehicle in connection with the homicide investigation. Asked if he had "reason to believe that either of the occupants were involved with that homicide," Det. Cramer answered as follows: "It was a potential. We knew that the vehicle was involved and it was, you know, we needed to figure out who was in control of that vehicle."

{¶ 10} The female driver and the male passenger of the Traverse were taken to separate police cars. At the hearing, Cramer identified the passenger of the Traverse as Foster.

{¶ 11} Cramer testified that he spoke with Foster, who identified himself as "Marcus." Cramer asked Foster his whereabouts and Foster stated that he had been "here, there and everywhere." According to Cramer, Foster was not under arrest at this point, although Foster was being questioned in the back of a police car. Cramer testified that Foster was arrested "the next time I interacted with him on WCS, it's once we had information concerning the ankle monitor."[1] Cramer expanded on this testimony: "We received information from the analysts and some other detectives that were back at the homicide unit that they had determined that by checking ankle monitors in the area of the homicide, that there was an ankle monitor in the area of the homicide at the time of the homicide and that that person was identified as Marcus Foster."

---

[1] It is unclear from the suppression hearing transcript what "WCS" is.

{¶ 12} Under cross-examination, Cramer testified that when he made the traffic stop, the police had "no persons of interest regarding the homicide . . . ." He further testified that his body-camera video showed that the traffic stop occurred between 9:00 and 9:30 a.m., approximately five hours after the shooting. Defense counsel and Cramer engaged in the following colloquy:

> Q: So detective, you testified that you had information about an ankle monitor, right?
>
> A: Yes.
>
> Q: Right? And it's your position that that information was gleaned from another officer who said that we got results that a Marcus Foster was in fact the person wearing an ankle device in that area?
>
> A: Correct. In the second WCS interview when I stick my camera on the side of the car, Detective Hudson calls me aside, that's the information that I'm getting.
>
> . . .
>
> Q: Do you recall whether or not you had a discussion as to what information you had about Marcus Foster to any of those officers [on the scene]?
>
> A: I don't remember the nature of those discussions.

{¶ 13} Cramer further testified that he did not see Foster with an ankle monitor and no other police officer reported to him that Foster was wearing an ankle monitor.

## B. Thomas Lascko

{¶ 14} Cleveland Police Detective Thomas Lascko ("Lascko") testified that he works in the crime scene records unit and his job duties include swabbing people for

gunshot residue ("GSR"). Lascko conducted a GSR kit examination on Foster on June 19, 2023, at the homicide unit of the police station.

### C. Brian Kellums

{¶ 15} Cleveland Police Department Homicide Detective Brian Kellums ("Kellums") testified that he responded to a call for "a male down" in the area of W. 84th Street and Denison on June 19, 2023. Walker was deceased when Det. Kellums arrived at the scene. According to Kellums, he "started canvassing the area, trying to talk to people. Look for cameras, collect any physical evidence that we locate on scene, mark it and have the crime scene guys take it with them." Kellums testified that he was the lead detective on this case.

{¶ 16} Kellums located a witness who "called in" the shooting. According to Kellums, Cramer spoke with this witness and learned about a Chevy Traverse that was a "possible suspect vehicle." Vesna Piscitello (the "Analyst"), who, according to Kellums, is "the RTCC analyst," looked through the RTCC videos to see if she could locate a Chevy Traverse in the area of the shooting. Police also located security cameras at the Peanut Bar, which is located "cater-corner" from the scene. The videos from these cameras showed "a vehicle speed across Denison Avenue from the north side of 84th Street and then continuing south on 84th Street" at approximately the same time as the shooting.

{¶ 17} The Analyst was able to identify the speeding vehicle as the Chevy Traverse, and the license plate of this vehicle was connected to a woman. Detectives went to the woman's house to see if the Traverse was there.

{¶ 18} In the meantime, Kellums was working with the Analyst "to see if there's anybody who is wearing an ankle monitor on probation or parole in a specific area . . . ." Kellums testified that "[w]e realized that Marcus Foster was in the area of the murder at the time of the shooting." Kellums testified that he did not know where Foster was when he received this information. Kellums was notified that Cramer "had conducted a traffic stop on the Chevy Traverse." At 9:33 a.m., Kellum called other officers "trying to let them know if there was a Marcus Foster in that car, that he should be arrested." After this, Foster was brought to the homicide unit and arrested.

## II. Court's Findings of Fact

{¶ 19} On the record at the suppression hearing, the court found probable cause for police to conduct an investigatory stop of the Traverse.

> That's where we get into the probable cause. The question is there was probable cause to do an investigatory stop of this vehicle because it was suspected to be used in a homicide. So that's the question. So what I'm saying you have the witness who stated that it was a Chevy Traverse, you had the Peanut Bar . . . video . . . . Also there is [sic] the 911 calls, they said all coalesced around this time frame in which the [license plate reader] camera confirmed that that vehicle was there at that time. . . .
>
> So I am finding that there's probable cause for them to stop and detain the suspect vehicle.

{¶ 20} Defense counsel, on the record, agreed with the court that there was probable cause to stop the Traverse. "But, your Honor, I agree with you. We have the targeted vehicle. The question is when you're talking about [a] person's liberty,

that's a different factual question. Whether or not they have reasonable suspicion that he was driving the vehicle."

{¶ 21} The court continued: "Here, this is the very definition of probable cause is same place at the same time as the incident so, I mean, you have — this is probable cause. I'm making a finding that this is probable cause that the vehicle — you already agreed with me, suspect vehicle, it's a suspect vehicle. There is probable cause there."

{¶ 22} The remainder of the suppression hearing concerned whether there was probable cause to arrest Foster, in addition to just stopping the Traverse, as well as the timing of discovering that Foster's ankle monitor put him at the scene of the crime when the shooting took place. A recitation of the evidence developed at the suppression hearing and the court's findings regarding probable cause to arrest is unnecessary in this appeal because Foster's first assignment of error is limited to the issue of whether the police properly conducted an investigatory stop of the Traverse. We quote Foster's appellate brief directly:

> What police involved in the stop heard from other police investigating the shooting in question is what led them to stop the vehicle. They were not operating on their own personal knowledge. And what they were told was that the vehicle they were following was present at the scene of a homicide several hours earlier that morning. Nobody knew who occupied the vehicle when the homicide occurred. Nobody knew the identity of the individuals who occupied the vehicle at the time of the stop. Nobody had reasonable suspicion that criminal behavior was ongoing. Therefore, there was no basis for the stop and all evidence gained by police as a result of the stop of the vehicle should have been suppressed.

{¶ 23} Our review of Foster's appellate brief shows that he does not argue on appeal any Fourth Amendment violation other than the allegedly improper investigatory stop of the Traverse.

## III. Law and Analysis

{¶ 24} We review Foster's assignments of error out of numerical order for ease of discussion.

### A. Ineffective Assistance of Counsel

{¶ 25} In Foster's second and third assignments of error, he argues that his trial counsel was ineffective for 1) failing "to preserve the issue of suppression" and 2) failing "to object to the admission of GPS location data" at his trial.

{¶ 26} To succeed on a claim of ineffective assistance of counsel, a defendant must establish that his or her attorney's performance was deficient and that the defendant was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668 (1984). However, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance." *Id*. at 697. *See also State v. Bradley*, 42 Ohio St.3d 136 (1989). Additionally, "failure to object to error, alone, is not sufficient to sustain a claim of ineffective assistance of counsel." *State v. Watson*, 2020-Ohio-3462, ¶ 43 (8th Dist.).

{¶ 27} "An order granting or denying a motion *in limine* is a tentative, preliminary or presumptive ruling about an evidentiary issue that is anticipated. An

appellate court need not review the propriety of such an order unless the claimed error is preserved by a timely objection when the issue is actually reached during the trial." *State v. Leslie*, 14 Ohio App.3d 343, 344 (2d Dist. 1984), citing *State v. White*, 6 Ohio App.3d 1 (8th Dist. 1982).

{¶ 28} A motion to suppress, on the other hand, is treated differently. "The purpose and effect of a motion to suppress and a motion in limine are distinct . . . . An important characteristic of a motion to suppress is that finality attaches so that the ruling of the court at the suppression hearing prevails at trial and is, therefore, automatically appealable by the state." *State v. French*, 72 Ohio St.3d 446, 449 (1995). *See also State v. Henry*, 2009-Ohio-434, ¶ 30 (12th Dist.) ("A motion to suppress determines with finality the admissibility of evidence. . . . [T]here is no need to renew the objection to the admission of the evidence at trial once the trial court denies the motion.").

{¶ 29} In this case, we need not review whether Foster's defense counsel re-objected to the evidence at trial. Because there is no need to re-object at trial to the admission of evidence that was the subject of a motion to suppress, this lack of objection cannot be the basis for an ineffective-assistance-of-counsel claim. *See Henry* at ¶ 30 ("[A]ppellant's trial counsel was not ineffective for failing to re-object to the admission of her confession when there was no reasonable basis for success.").

{¶ 30} Accordingly, Foster's second and third assignments of error are overruled.

**B. Motions to Suppress**

{¶ 31} In his first assignment of error, Foster argues that the trial court erred by denying his motions to suppress. Specifically, Foster argues that the "question in the scenario presented is whether police had reasonable suspicion to conduct an evidentiary stop of the vehicle in question . . . ." Foster further argues that "the suspicion possessed must be present in the present tense, not that the person has committed crimes in the past." According to Foster, the police "were told . . . that the vehicle they were following was present at the scene of a homicide several hours earlier that morning." Additionally, Foster argues that "there was no basis for the stop and all evidence gained by police as a result of the stop of the vehicle should have been suppressed."

{¶ 32} "Appellate review of a motion to suppress involves a mixed question of law and fact." *State v. Burnside*, 2003-Ohio-5372, ¶ 8. Appellate courts defer to trial courts' findings of fact because they are "in the best position to evaluate the credibility of witnesses and resolve factual discrepancies." *State v. Hakim*, 2018-Ohio-969, ¶ 19 (8th Dist.). "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8. "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id*.

{¶ 33} The Fourth Amendment to the United States Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects,

against unreasonable searches and seizures," and provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Ohio Constitution, Article I, Section 14, is nearly identical to its federal counterpart. *State v. Kinney*, 83 Ohio St.3d 85, 87 (1998).

{¶ 34} "An investigative stop or a *Terry* stop is a common exception to the Fourth Amendment warrant requirement." *State v. Phillips*, 2016-Ohio-7049, ¶ 13 (8th Dist.), citing *Terry v. Ohio*, 392 U.S. 1 (1968). Under *Terry*, "a police officer may stop and briefly detain a person if the officer has reasonable suspicion based upon specific articulable facts that the suspect is engaged in criminal activity." *Id.* Additionally, a traffic stop is considered a seizure and implicates Fourth Amendment protections. *Delaware v. Prouse*, 440 U.S. 648 (1979). "Nevertheless, a warrantless traffic stop is constitutionally valid if the officer making the stop has 'a reasonable suspicion,' based on specific articulable facts, that 'criminal activity may be afoot.'" *Cleveland v. Maxwell*, 2017-Ohio-4442, ¶ 18 (8th Dist.), quoting *Terry* at 30. Under *Terry*, reasonable suspicion requires something more than a "hunch." *Terry* at 27. "The propriety of an investigative stop must be viewed in light of the totality of the circumstances 'as viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.'" *Maxwell* at 19, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88 (1991).

{¶ 35} Prior to reviewing the facts of this case under the traditional framework for suppression hearings as outlined above, we note that Foster's

argument that persons who committed a crime, in the past tense, are not subject to reasonable searches and seizures is without merit. In *United States v. Hensley*, 469 U.S. 221, 229 (1985), the United States Supreme Court held as follows:

> We need not and do not decide today whether *Terry* stops to investigate all past crimes . . . are permitted. It is enough to say that, if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion.

*See also State v. Roberts*, 2016-Ohio-4806, ¶ 18 (7th Dist.) (citing *Hensley* and holding that "*Terry* stops may also be used to investigate persons suspected of being involved in completed felonies").

{¶ 36} In this case, the court found that the Traverse was "suspected to be used in a homicide." To support this finding, the following evidence was presented at the suppression hearing: a 911 call reported a shooting in the area of W. 84th Street and Denison Avenue; when police arrived at the scene, they found Walker lying in the street deceased from gunshot wounds; police testified that a witness saw a car that matched the Traverse's general description speed away from the shooting; video footage from several surveillance cameras showed the Traverse speeding away from the shooting; and surveillance video footage revealed the license plate number of the Traverse. Upon review, we find that this is competent and credible evidence that the Traverse was involved in a fatal shooting. Therefore, we must accept the court's finding that the Traverse was "suspected to be used in a homicide" as true. *Burnside*, 2003-Ohio-5372, at ¶ 8. Furthermore, we find that reasonable suspicion

of a vehicle having been used in a murder is enough to justify a *Terry* investigatory stop of this vehicle under these circumstances. *See, e.g., State v. Figueroa*, 2010-Ohio-189, ¶ 23 (9th Dist.) ("[T]he deputy had a reasonable and articulable suspicion of criminal activity to justify stopping a vehicle he had previously identified as having been used recently in relation to a credit card theft" based, in part, on identification of the suspect from "security photographs taken during the unauthorized use of the credit card . . . .").

{¶ 37} Accordingly, we find no Fourth Amendment violations in the investigatory stop of the Traverse. The court did not err by denying Foster's motions to suppress, and his first assignment of error is overruled.

{¶ 38} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, ADMINISTRATIVE JUDGE

LISA B. FORBES, J., and
EILEEN T. GALLAGHER, J., CONCUR